1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES MILLER,                               Civ. No.  12-2974 KJM AC

12              Plaintiff,

13       v.                                       ORDER

14    AMERIGAS PARTNERS, L.P.,

15              Defendant.

16

17              This case was on calendar on February 14, 2013 for a hearing on the motion for

18    summary judgment filed by AmeriGas Partners, L.P. (AmeriGas).  Gregory Ramirez of Myers,

19    Widders, Gibson, Jones & Feingold, LLP, appeared for plaintiff James Miller; Melinda Riechert

20    of Morgan, Lewis & Bockius, LLP, appeared for AmeriGas. After considering the parties'

21    arguments, the court GRANTS the motion.

22    I.  BACKGROUND

23              On October 31, 2012, Miller filed a complaint in Mono County Superior Court

24    alleging generally that he had been employed as a District Manager by Heritage Propane in

25    Mammoth Lakes, California since 1997; in October 2011, Heritage announced that its rival

26    AmeriGas had acquired Heritage; in January 2012, Heritage employees received a transition

27    packet from AmeriGas, including a "Confidentiality and Post Employment Agreement" providing

28    that any employee would not solicit AmeriGas employees or sell propane within a fifty mile

1    radius from an AmeriGas District Office for two years after leaving AmeriGas; Miller refused to

2    sign the agreement; AmeriGas let employees know there would be some layoffs because, for

3    example, there could be only one manager in an area that had had both Heritage and AmeriGas

4    offices; within a month of his second refusal to sign the agreement, plaintiff was interviewed for

5    the position of manager of the combined Bishop/Mammoth Lakes region; about a month after the

6    interview Lisa Thomas, one of the interviewers, arrived at the Mammoth Lakes office, and

7    informed plaintiff he had not been selected for the manager position.  ECF No. 1-1 at 8-14.  The

8    complaint contains two claims:  (1) wrongful termination in violation of public policy; and

9    (2) unfair business practices in violation of California Business and Professions Code §§ 17200,

10   *et seq*.

11           On December 10, 2012, AmeriGas removed the case to this court.  ECF No. 1.

12   The instant motion was filed on December 20, 2013.  ECF No. 21.

13   II.  STANDARDS FOR A MOTION FOR SUMMARY JUDGMENT

14           A court will grant summary judgment "if . . . there is no genuine dispute as to any

15   material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

16   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

17   resolved only by a finder of fact because they may reasonably be resolved in favor of either

18   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[1]

19           The moving party bears the initial burden of showing the district court "that there

20   is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

21   477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

22   that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio

23   Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

24   parts of materials in the record . . .; or show [] that the materials cited do not establish the absence

25   or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

26   

27           [1] Rule 56 was amended, effective December 1, 2010.  However, it is appropriate to rely on
     cases decided before the amendment took effect, as "[t]he standard for granting summary
     judgment remains unchanged."  FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010

28   amendments.

1  support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

2  nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

3  material facts").  Moreover, "the requirement is that there be no genuine issue of material fact . . .

4  . Only disputes over facts that might affect the outcome of the suit under the governing law will

5  properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in

6  original).

7          In deciding a motion for summary judgment, the court draws all inferences and

8  views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

9  587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

10  whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

11  issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.

12  *Co.*, 391 U.S. 253, 289 (1968)).

13          A court may consider evidence as long as it is "admissible at trial." *Fraser v.

14  Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  "Admissibility at trial" depends not on the

15  evidence's form, but on its content.  *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)

16  (citing *Celotex Corp.*, 477 U.S. at 324).  The party seeking admission of evidence "bears the

17  burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir.

18  2002).  If the opposing party objects to the proposed evidence, the party seeking admission must

19  direct the district court to "authenticating documents, deposition testimony bearing on attribution,

20  hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in

21  question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86

22  (9th Cir. 2010).

23  III.  EVIDENTIARY OBJECTIONS

24          Each party objects to some of its opponent's evidence.  The court resolves these

25  disputes only as to that evidence it deems relevant and material.

26          A.  Miller's Objections

27          Miller raises an hearsay objection to paragraphs in the declarations of AmeriGas

28  employees Lisa Thomas, Richard Martinelli, Gary Browne, and Cassandra Russo, incorporating

3

1    their notes of their interview of Jeff Pahlow for the manager's position.  *See, e.g.*, Decl. of Gary

2    Browne, ECF No. 25 ¶ 4 & Ex. B ("Attached hereto as <u>Exhibit B</u> is a true and correct copy of the

3    Interview Guide I filled out when interviewing Jeff Pahlow . . . .  The notes contain accurate

4    summaries of statements Pahlow made at his interview.").  AmeriGas is not asking the court to

5    consider the truth of what Pahlow said during the interview, but that the interview panel relied

6    upon what he said; the court overrules the hearsay objection.  *See Bergene v. Salt River Project*

7    *Agr. Imp. and Power Dist*., 272 F.3d 1136, 1142 (9th Cir. 2001) (finding a statement was not

8    hearsay when not offered for the truth of the matter asserted).

9            Miller next objects to Regional Human Resources Manager Shirley Kelley's claim

10   to be aware of at least two former Heritage employees who did not sign the confidentiality

11   agreement and yet have remained employed by AmeriGas, arguing the claim is vague and lacks

12   foundation.  Decl. of Shirley Kelley, ECF No. 24 ¶ 2.  The court agrees the statement is too vague

13   for it to have any relevance, as there is no indication the employees were in the same position that

14   Miller sought and that the same considerations of confidentiality would apply to employees

15   holding other jobs within the company.

16           Finally, Miller objects to Lisa Thomas's deposition testimony that "there was a

17   directive that we could offer anybody that didn't take the position that we wanted to, they didn't

18   have to sign the agreement.  It wasn't an issue at that point.  [¶]  And that came from Paul

19   Grady."  Decl. of Yin Zheng, Ex. B, Dep. of Lisa Thomas, ECF No. 23-2 at 20:23-21:2.  The

20   court will not consider this as evidence there was such a policy, but to the extent it shows

21   Thomas's state of mind in making a hiring decision or the effect on Thomas, it is not hearsay.

22   *See United States v. Arteaga*, 117 F.3d 388, 397-98 (9th Cir. 1997).

23           B.  AmeriGas's Objections

24           AmeriGas objects to a paragraph of Miller's declaration describing an email he

25   received from Louis Escarcega and identifying the attachments to that email, which Miller

26   characterizes as coming from Vice-President of Operations Jim Gunnick.  Decl. of James Miller,

27   ECF No. 32 ¶ 7 & Ex. C.  AmeriGas has presented evidence that Escarcega did not forward the

28   original spreadsheet sent by Gunnick but rather substituted another.  *See, e.g.*, Second Decl. of

4

1  Gary Browne, ECF No. 38. The court will not consider either Miller's characterization of the

2  email, which speaks for itself, or the attachment Miller identifies, as he has no personal

3  knowledge that the attachment he identifies is the one Gunnick sent to Martinelli and Browne.

4  *See Block*, 253 F.3d at 419 (stating affidavit must be based on personal knowledge).

5  IV.  FACTS

6         When the parties agree a fact is undisputed, the court refers to their agreement

7  rather than to the portions of the record supporting the agreement.  When the facts are disputed,

8  the court notes the disagreement and cites to the supporting record cites.  The court does not cite

9  to any facts that are irrelevant to resolution of the pending motion.

10         James Miller worked for Heritage Propane from 1997 to 2011, managing the

11  Mammoth Lakes Division.  Miller Decl., ECF No. 32 ¶ 1.  In January 2012, AmeriGas acquired

12  Heritage.  AmeriGas's Response to Miller's Statement of Facts, ECF No. 37 ¶ 1.  AmeriGas sent

13  Miller a new-hire packet, which included a "Confidentiality and Post-Employment Agreement"

14  (Agreement), which sought to prohibit Miller from soliciting any AmeriGas customer or working

15  with any AmeriGas competitor within fifty miles of Mammoth Lakes for two years following any

16  termination of Miller's employment.  *Id.* ¶¶ 32.1, 32.3-32.4.  The Agreement states, among other

17  things, that "the execution of this agreement is a requirement of my employment with AmeriGas

18  . . . .," and requires an employee to disclose the existence of the agreement to potential employers.

19  *Id.* ¶¶ 32.6, 32.9.

20         On April 2, 2012, Miller notified AmeriGas he would not sign the Agreement

21  because he believed it to be unreasonable and possibly in violation of the law.  *Id.* ¶ 32.13.  In

22  May, AmeriGas employee Escarcega twice emailed Miller asking him to return the signed

23  Agreement.  ECF No. 32, Ex. C at 13.[2]  On May 11, 2012, Miller again refused to sign the

24  Agreement.  ECF No. 37 ¶ 32.16.

25         After the acquisition, there was some overlap between AmeriGas and former

26  Heritage districts.  Miller's former district overlapped with AmeriGas's Mammoth Lakes/Bishop

27  _____

   [2] The court refers to the pagination assigned by the ECF system.

28

1    District.  Jeff Pahlow was District Manager ("DM") for the Mammoth Lakes/Bishop district.

2    ECF No. 37 ¶ 3.  Both Miller's and Pahlow's areas were in AmeriGas's Area 46.  *Id.* ¶ 4.

3            Because of the overlap, a panel of AmeriGas employees interviewed Miller and

4    Pahlow to decide which DM to retain in their portion of Area 46 and interviewed other DMs of

5    overlapping areas as well.  *Id.* ¶¶ 2, 5.  The panel consisted of the following:  Lisa Thomas, Area

6    Director for Area 46; Gary Browne, Area Director for Area 45; Richard Martinelli, Area Director

7    for Area 44; and Cassandra Russo, Area Sales Manager for Areas 44, 45 and 46.  *Id.* ¶ 5.  Lisa

8    Thomas was aware Miller had refused to sign the Agreement, but the panelists did not discuss the

9    refusal to sign as part of their decision making process.  *Id.* ¶¶ 32.14, 32.17; ECF No 27 ¶¶ 8-9;

10   ECF No. 25 ¶¶ 8-9; ECF No. 26 ¶¶ 8-9.[3]  Thomas herself had signed the Agreement because she

11   was "personally okay" with it, "because in my . . . personal beliefs and my personal ethics . . . I

12   wouldn't want to share information that was entrusted to me with a new employer . . . ."  ECF

13   No. 31 at 33:13-17.

14           Miller disputes that Thomas was the only panel member aware of his refusal to

15   sign, saying that Martinelli and Browne received an email from Jim Gunnick with an attached

16   spreadsheet showing Miller's refusal to sign the agreement.  ECF No. 32 ¶ 7; ECF No. 32 at

17   14-20.  As noted above, the court has sustained AmeriGas's objection to this portion of Miller's

18   declaration because Miller did not have personal knowledge that the spreadsheet he received was

19   the one Gunnick sent to Martinelli and Browne.  In addition, both Martinelli and Browne have

20   submitted rebuttal declarations, describing the document they received from Gunnick on May 9,

21   2012 as a 238 page spreadsheet showing those employees who had not completed paperwork.

22   ECF Nos. 38 & 39.  They acknowledge Miller's name is on the document they received, but aver

23   they did not notice Miller's name because he was not in their districts and so was not their

24   responsibility.  *Id.*  Despite their disavowals, the evidence of record creates a disputed issue of

25   fact concerning what Martinelli and Browne knew, if anything, of plaintiff's refusal to sign the

26   Confidentiality Agreement.

27   ───────────────

28        [3]  ECF Nos. 26 and 27 each contain two paragraphs numbered "8."  The court refers here
     to the second paragraph eight.

For the new DM interviews, panel members were given Interview Guides with questions they could ask the interviewees and space for notes.  Decl. of Lisa Thomas, ECF No. 28 ¶¶ 5, 10; Decl. of Richard Martinelli, ECF No. 26 ¶ 3; Decl. of Cassandra Russo, ECF No. 27 ¶ 3; Decl. of Gary Browne, ECF No. 25 ¶ 3.  Miller disputes this, asserting the panelists were required to follow the Guide without variation.  In support he provides a snippet of Shirley Kelley's deposition, during which Kelley, a Human Resources Manager, said she "strongly encourage[d]" the panelists to follow the guide.  Decl. of James Perero, Ex. I, Dep. of Shirley Kelley, ECF No. 31 at 69:11-16.  There is no explanation in this portion of the transcript of what Kelley meant by "follow the guide."  Just before the portion on which plaintiff relies, Kelley says there is no written protocol for how the panel should conduct and score the interviews, because the guide "is only a tool."  *Id.* at 20:17-20.[4]  Miller thus fails to identify a dispute on this question. He also fails to identify any dispute by citing to Thomas' testimony that the panelists reviewed interview procedure, including the guide, with Kelley.  *Id.* at 29.

The panel interviewed Pahlow on May 31, 2012 and Miller on June 6, 2012, using the interview guides.  ECF No. 37 ¶¶ 6-7.  Although the panel did not ask all the questions in the guide, they asked Miller and Pahlow the same questions.  *See, e.g.*, ECF Nos. 28-1 & 28-8 (Thomas's guide for Miller and Pahlow); ECF Nos. 26-1 & 26-2 (Martinelli's guide for Miller and Pahlow).  Martinelli was concerned about Miller's attitude generally and specifically regarding blending the two companies.  ECF No. 26 ¶ 4.  Russo thought Miller's answers were difficult to follow and lacked substance.  ECF No. 27 ¶ 4.  Thomas believed Miller's negative attitude toward AmeriGas would hamper his ability to blend the two districts.  ECF No. 28 ¶ 6. Thomas did not consider Miller's refusal to sign the Confidentiality Agreement in reaching her decision; she had in fact been told the panel's decision was not constrained by any candidate's refusal to sign the Agreement.  ECF No. 23-2 at 116: 23-117:7.

The panel decided to submit a single evaluation for each interviewee.  ECF No. 27 ¶ 6; ECF No. 25 ¶ 5; ECF No. 26 ¶ 6; ECF No. 28 ¶¶ 12-13.  Thomas filled out the evaluations.

---

[4] Plaintiff has lodged Kelley's deposition as required by Local Rule 133(j).

1   *Id*. & Exs. C & D.  Each panel member concurred in the evaluations Thomas recorded.  ECF

2   No. 26 ¶ 6; ECF No. 27 ¶ 6; ECF No. 25 ¶ 5; ECF No. 28 ¶ 14.

3              After the panel had finished all the interviews for the area 46 DM, they compiled a

4   selection scorecard, which compared and contrasted the candidates' information; on the basis of

5   the scorecard, the panel recommended the position be given to Pahlow rather than Miller.  ECF

6   No. 25 ¶¶ 6-7; ECF No. 26 ¶¶ 7-8; ECF No. 27 ¶¶ 7-8; ECF No. 28 ¶¶ 16-17 & Ex. E.

7              After the interviews, the Guides, Evaluation Sheets and Selection Scorecard were

8   submitted to Jim Gunnick, a Heritage employee who had become Vice President of Operations at

9   AmeriGas and who was responsible for approving the DM selections.  ECF No. 37 ¶ 23.  After a

10  conference call with the interview panel, he concluded Miller was not the best candidate for the

11  position.  Dep. of James Gunnick, ECF No. 31 at 75:1-6, 19-21 & 76:8-10; Thomas Dep., ECF

12  No. 23-2 at 34:21-24.

13             At argument on the motion, Miller's attorney said Gunnick was aware of Miller's

14  refusal to sign the Agreement.  Although Miller does not include this explicitly in his Statement

15  of Undisputed Facts, he did respond to AmeriGas's statement by citing to the email Martinelli

16  and Browne received from Gunnick along with the spreadsheet of employees who had not

17  completed items of the required paperwork.  ECF No. 37 ¶ 26.  As noted above, in their reply

18  declarations, Martinelli and Browne each identify a 235 page spreadsheet Gunnick sent by e-mail,

19  which included information that Miller had not signed the Agreement.  ECF No. 38; ECF No. 39

20  ¶ 2 & Ex. A.  Although Miller has presented no evidence that Gunnick read every line of the

21  spreadsheet or was otherwise aware of Miller's response to the Agreement, the evidence he points

22  to raises an inference of Gunnick's knowledge.

23             Thomas met with Miller on July 3, 2012 and told him he had not been selected for

24  the DM position.  ECF No. 37 ¶ 29.

25  V.  WRONGFUL TERMINATION

26             In *Tameny* v. *Atlantic Richfield Co.*, the California Supreme Court explored the

27  question whether an at-will employee ever had a remedy against an employer for termination or

28  other adverse employment actions.  27 Cal.3d 167 (1980).  The court concluded that "when an

1    employer's discharge of an employee violates fundamental principles of public policy, the

2    discharged employee may maintain a tort action and recover damages traditionally available in

3    such actions." *Id*. at 170.  Such claims fall into four categories:  "the employee (1) refused to

4    violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory

5    right or privilege; or (4) reported a statutory violation of the public's benefit." *Green v. Ralee*

6    *Eng'g Co.*, 19 Cal. 4th 66, 76 (1998).

7            In *D'Sa v. Playhut, Inc.*, the California Court of Appeal for the Second Appellate

8    District said:

9            We hold an employer cannot lawfully make the signing of an
             employment agreement, which contains an unenforceable covenant
10           not to compete, a condition of continued employment . . . . We
             further hold that an employer's termination of an employee who
11           refuses to sign such an agreement constitutes a wrongful
             termination in violation of public policy.
12

13   85 Cal. App. 4th 927, 929 (2001).  AmeriGas does not argue its Confidentiality Agreement was

14   legal, but rather argues Miller has not established a nexus between the public policy at stake and

15   his termination.  ECF No. 21 at 13.

16           Whatever the category, a plaintiff alleging wrongful termination must establish his

17   prima facie case by showing "(1) he or she engaged in a 'protected activity,' (2) the employer

18   subjected the employee to an adverse employment action, and (3) a causal link existed between

19   the protected activity and the employer's action." *Loggins v. Kaiser Permanente Int'l*, 151 Cal.

20   App. 4th 1102, 1109 (2007); *Mendoza v. Western Med. Ctr. Santa Anna*, 222 Cal. App. 4th 1334,

21   1341-1342 (2014) (plaintiff must show protected conduct was substantial motivating factor for

22   adverse action); *see also Wright v. Thrifty Payless, Inc*., No. 2:13-CV-1681 KJM, 2013 WL

23   5718937, at *6 (E.D. Cal. Oct. 15, 2013) (stating employee must show nexus between his

24   protected activity and employer's adverse action).  "Causation sufficient to establish the third

25   element of the prima facie case may be inferred from circumstantial evidence, such as the

26   employer's knowledge that the plaintiff engaged in protected activities and the proximity in time

27   between the protected activity and the allegedly retaliatory employment decision." *Yartzoff v.*

28   *Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Raad v. Fairbanks N. Star Borough Sch.*

                                                    9

1   *Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003), *amended on denial of reh'g*, No. 00-35999, 2003 WL

2   21027351 (9th Cir. May 8, 2003) (temporal proximity between protected activity and adverse

3   action may give rise to inference of retaliation).

4          AmeriGas argues plaintiff cannot establish a nexus for several reasons:

5   (1) Thomas was the only member of the interview panel who was aware of Miller's refusal to

6   sign the Agreement; (2) the panel did not discuss Miller's refusal; and (3) the panel members

7   reached consensus that Pahlow was more qualified based on the interviews and their scoring of

8   the candidates.  ECF No. 21 at 14.

9          Miller counters that the evidence shows the panel merely ratified Thomas's

10  decision to select Pahlow over Miller and that Gunnick also simply rubberstamped Thomas's

11  decision.  He disputes that the decision was made by consensus.  First, Miller cites the following

12  portion of Thomas's deposition:  "And that you're starting from scratch from day one, once you

13  offer that position to the person, going forward.  He was going to be on my team going forward.

14  Anybody that I chose."  ECF No. 31 at 52: 4-7.  However, Thomas made this comment as part of

15  an exploration of the interview panel's discussion of the candidates' safety records and her

16  concerns with the candidates' ability to manage a large district, particularly because the person

17  selected would be on her team; it is not properly read as a claim that the authority to choose the

18  DM was hers alone.  This one statement taken out of context does not create a dispute.  *See, e.g.,*

19  *Kesinger ex. rel Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004) (finding

20  statement taken out of context does not create disputed issue).

21         Miller also provides an email from Martinelli, responding to Shirley Kelley's

22  inquiry about a conversation Martinelli had with Miller after the DM was selected, in which

23  Martinelli reports Miller's asking "why he didn't make the cut."  Martinelli says he told Miller he

24  "wasn't sure of the direct reason, though [he] was on the interview panel, the final decisions were

25  in each Area Director hands along with the interview process results."  ECF No. 31 at 63

26  (reproduced as in original).  This email does not create a genuine issue of fact, for Martinelli does

27  not say the Area Director's decision was controlling, but rather that the "interview process

28  results" also played a role in the decision.  *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir.

1  2009) ("In order to avoid summary judgment, a non-movant must show a genuine issue of

2  material fact by presenting *affirmative evidence* from which a jury could find in his favor.  A non-

3  movant's bald assertions or a scintilla of evidence in his favor are both insufficient to withstand

4  summary judgment) (internal citation omitted, emphasis in original); *Triton Energy Corp. v.*

5  *Square D Co*., 68 F.3d 1216, 1221 (9th Cir. 1995) (inferences may be drawn from non-moving

6  party's evidence "so long as such evidence was of sufficient 'quantum or quality'").

7         Miller further contends Gunnick was authorized to ratify Thomas's chosen

8  candidate and simply said "that's fine" during the conference call about the hiring decision.  His

9  citation to Gunnick's deposition does not support this claim, for Gunnick does not say his role

10  was to ratify Thomas's candidate, but rather to have the final word as to who was chosen.

11  Gunnick Dep. at 23:18-20.  Gunnick also said he reviewed the interview materials Shirley Kelley

12  sent him, participated in a conference call with the interview panel, and concluded Miller was not

13  the best candidate.  *Id*. at 24:1-21.  Miller's additional citation to Thomas's deposition similarly

14  does not create a disputed issue, for again he takes Thomas's statement out of context.  Thomas

15  testified that when the panel members had the conference call with Gunnick, they went down the

16  list, manager by manager, reporting their decision and Gunnick said "I agree" or "not agree" or

17  "that's fine."  Thomas Dep. at 90:16-23.  Earlier in the deposition, Thomas echoed Gunnick's

18  description of the process:  all the paperwork was sent to Gunnick and Kelley and then the panel

19  reviewed all this material with Gunnick during a conference call.  *Id*. at 34:21-35:2.  Miller's

20  reference to an isolated portion of Thomas's deposition does not create a dispute as to whether

21  Gunnick acted only to rubber-stamp Thomas's or even the panel's decision.

22         Based on the above discussion of the evidence, plaintiff's showing is not strong.

23  But his burden of establishing his prima facie case is not onerous.  *Snead v. Metro. Prop. & Cas.*

24  *Ins. Co*., 237 F.3d 1080, 1091 (9th Cir. 2001).  In this case, there is no dispute that Thomas, the

25  Area Director, was aware of plaintiff's refusal to sign the Agreement.  There is disputed evidence

26  concerning Martinelli's and Browne's knowledge of the refusal.  Although plaintiff has not

27  shown that Thomas alone controlled the hiring process, Thomas's input as Area Director may

28  have had some influence on the interview panel and Gunnick's decision.  *See*, *e.g.*, *DeJung v.*

11

*Superior Ct*., 169 Cal. App. 4th 533, 551 (2008) ("Showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (recognizing that a subordinate's bias stemming from plaintiff's protected activity might be imputed to ultimate decisionmaker under some circumstances); *Shager v. Upjohn Co*., 913 F. 2d 398 (7th Cir. 1990) (even in absence of evidence any member of committee harbored hostility to older workers, older worker may establish prima facie case by showing supervisor's discriminatory animus influenced decision).  Moreover, there is evidence suggesting Gunnick himself, who had final authority over the DM decision, was aware of Miller's rejection of the Agreement.  In addition, there is no dispute that Miller made clear his belief in the illegality of the Agreement in April and again in May; then in June, the panel decided not to offer him the position.  The combination of the temporal proximity and the evidence that three panel members and Gunnick might have been aware of Miller's protected activity, though weak, is sufficient to satisfy the burden of establishing a prima facie case.

Courts apply the *McDonnell-Douglas* framework in evaluating wrongful discharge cases.  *Loggins*, 151 Cal. App. 4th at 1109; *Vargas v. BP Am. Inc*., ___ F. App'x ___, 2013 WL 6487508, at *1 (9th Cir. Dec. 11, 2013) (unpublished); *Washington v. Ca. City Corr. Ctr.*, 871 F. Supp. 2d 1010, 1030 (E.D. Cal. 2012).  Under that framework, once the plaintiff has established his prima facie case, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  If that burden is satisfied, then the burden returns to the plaintiff to show that the articulated reason is a pretext "'by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting *Chuang v. University of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)).  The presumption of discrimination "drops out of the picture" once the employer meets its burden of production, but "the trier of fact may still consider the evidence establishing plaintiff's

1    prima facie case" in evaluating whether the employer's explanation is pretextual.  *Reeves v.*

2    *Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000).

3              AmeriGas has offered evidence that it chose Pahlow after the interview process

4    based on his higher scores on the questions the panel asked, leading the panel to find Pahlow was

5    more qualified to be DM of a large, blended district.  This satisfies AmeriGas's burden to

6    articulate a legitimate non-retaliatory reason for choosing Pahlow over Miller.  *See, e.g.,*

7    *Villalta v. City & Cnty. of San Francisco*, 448 F. App'x 697, 699 (9th Cir. 2011) (unpublished)

8    (finding employer satisfied its burden by producing evidence it promoted people who were rated

9    higher during interview process); *Gardias v. San Jose State Univ*., Nos. C04–04086 HRL,

10   C04-04768 HRL, C05–01242 HRL, C05–01833 HRL, C06–04695 HRL, 2009 WL 928112, at

11   *13 (N.D. Cal. Mar. 31, 2009).  The burden thus returns to Miller.

12             "A plaintiff may demonstrate pretext in either of two ways:  (1) directly, by

13   showing that unlawful discrimination more likely than not motivated the employer; or

14   (2) indirectly, by showing that the employer's proffered explanation is not worthy of credence."

15   *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1113 (9th Cir. 2011).  Direct evidence

16   includes discriminatory or retaliatory statements or actions by the employer.  *Munoz v. Mabus*,

17   630 F.3d 856, 865 (9th Cir. 2010); *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir.

18   1998) ("'Direct evidence is evidence, which if believed, proves the fact of [discriminatory

19   animus] without inference or presumption.'") (quoting *Davis v. Chevron, U.S.A., Inc*., 14 F.3d

20   1082, 1085 (5th Cir. 1994)) (alteration in original).  Miller has presented no direct evidence of

21   retaliatory animus.

22             Miller suggests AmeriGas's explanation is not worthy of belief because the panel

23   did not ask all the questions in the Interview Guide and did not separately score the candidates.

24   Deviations from protocol and procedural irregularities may give rise to an inference of pretext.

25   *Porter v. Cal. Dep't of Corr*., 419 F.3d 885, 896 (9th Cir. 2005).  As noted above, however,

26   Miller's evidence does not show the panel was required to ask all the questions or prepare

27   separate score sheets rather than providing a single consensus scores.  Moreover, even assuming

28   the panel's method was in fact a departure from the required protocol, it does not support Miller's

1   pretext theory, as the panel used the same procedures to evaluate both Pahlow and Miller.  *See*

2   *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 n.9 (10th Cir. 2000) ("[W]here 'the

3   alleged procedural irregularity disadvantaged all potential applicants' for a promotion, rather than

4   just members of a protected class, the fact that a company failed to follow its own procedures

5   'does not suggest either that the defendant's proffered reasons for its employment decisions were

6   pretextual or that the defendant was motivated by illegal discrimination.'") (quoting *Randle v.*

7   *City of Aurora*, 69 F.3d 441, 454 n.20 (10th Cir. 1995)).

8          Miller also points to Thomas's alleged reliance on impressions she formed of

9   Miller during a managers' meeting in May.  ECF No. 34 at 6-7.  Thomas describes a meeting she

10  had with a group of managers, including Miller, where she asked them to fill out worksheets that

11  would help determine staffing in the blended companies.  ECF No. 31 at 41: 8-16.  She said the

12  main purpose of the exercise was to evaluate the participants' management style and how they

13  perceived their employees.  *Id.* at 42: 5-6, 43:2-5.  After this meeting, Thomas concluded Miller

14  "was a little resistant to the changes . . . .  Kind of downtalked AmeriGas on a few of the

15  occasions.  [¶]  He was outgoing.  Very personable with the rest of the group.  [¶]  He didn't want

16  to change the brand name . . . ."  *Id.* at 43:18-24.  Thomas believed Miller was resistant to

17  working for AmeriGas; she reported he said AmeriGas did not view their employees as people.

18  *Id.* at 44:19-24.

19         Miller has presented no evidence, however, that that the panel was supposed to be

20  completely ignorant of the candidates.  Moreover, to the extent this last evidence shows anything

21  about the selection process it is that Thomas formed somewhat negative impressions of Miller's

22  management style and his commitment to AmeriGas, not that she came to any conclusions based

23  on Miller's refusal to sign the Confidentiality Agreement.  The evidence does not undermine

24  AmeriGas's proffered reason for not offering Miller the DM position and ultimately discharging

25  him, or suggest the reason is based on retaliatory animus.

26  VI.  Unfair Competition Law

27         In his second claim, plaintiff alleges he is "entitled to injunctive relief in the form

28  of a judicial declaration that the AmeriGas Agreement is null and void in the State of California,

14

1    and a decree barring AmeriGas from requiring California employees to execute the AmeriGas

2    Agreement."  ECF No. 1 ¶ 46.

3              California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or

4    fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  CAL.

5    BUS. & PROF. CODE § 17200.  An act violates the UCL if it is "unlawful," "unfair" or

6    "fraudulent."  *Rubio v. Capitol One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010), *cert. denied*, 131

7    S.Ct. 1817 (2011).  An employer's use of a noncompete clause is "unlawful" under the UCL.

8    *Dowell v. Biosense Webster, Inc*., 179 Cal. App. 4th 564, 575 (2009).

9              To assert a UCL claim, a plaintiff must have "'suffered injury in fact and . . . lost

10   money or property as a result of the unfair competition.'"  *Rubio*, 613 F.3d at 1203–04 (quoting

11   CAL. BUS. & PROF. CODE § 17204 (alteration in original)).  There must be a causal connection

12   between the defendant's alleged UCL violation and the plaintiff's injury in fact.  *Id*.  If plaintiff

13   has standing under section 17204, he may seek injunctive relief under the UCL.  *Clayworth v.*

14   *Pfizer, Inc*., 49 Cal.4th 758, 789-90 (2010); CAL. BUS & PROF. CODE § 17203 ("Any person who

15   engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court

16   of competent jurisdiction.").

17             AmeriGas argues Miller does not have standing under the UCL because he cannot

18   show he lost money or property as a result of its noncompete clause.  More fundamentally,

19   however, Miller lacks constitutional standing to seek injunctive relief.

20             To meet the standing requirements of Article III of the Constitution, "a plaintiff

21   must show that he is under threat of suffering 'injury in fact' that is concrete and particularized;

22   the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable

23   to the challenged action of the defendant; and it must be likely that a favorable judicial decision

24   will prevent or redress the injury."  *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009).  Past

25   injury by itself does not establish standing.  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir.

26   2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 2456 (2011); *Mayfield v. United States*, 599 F.3d

27   964, 970 (9th Cir.), *cert. denied* 131 S.Ct. 503 (2010) ("Once a plaintiff has been wronged, he is

28   entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he

15

1   will again be wronged in a similar way.'" (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111

2   (1983))).  Miller has not shown he will be harmed in the future by the clause and so cannot seek

3   declaratory or injunctive relief based on his UCL claim.  *Campion v. Old Republic Home Prot.*

4   *Co., Inc.*, 861 F. Supp. 2d 1139, 1146-48 (S.D. Cal. 2012) (distinguishing Article III standing

5   from UCL standing).

6               IT IS THEREFORE ORDERED that:

7               1.  Defendant's motion for summary judgment, ECF No. 21, is granted; and

8               2.  The case is closed.

9   Dated:  March 18, 2014.

10

11                                                                _____

12                                                                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28